In the Matter of the CHASE NATIONAL BANK (BLANSHARD).

Supreme Court, New York County, May 15, 1935.

*Alfred J. Talley & Lamb* [*Alfred J. Talley* of counsel], for The Chase National Bank.

*Paul Windels* [*Oscar S. Cox, John M. Gaston, Jr.,* and *Hyman W. Kehl* of counsel], for the respondent, Paul Blanshard.

COTILLO, J.   This is a motion to vacate a subpœna issued by the commissioner of accounts directing the assistant comptroller of the Chase National Bank, the owner of the building at No. 15 Broad street, to appear for examination and to produce " all books, records and papers of every kind, character or description appertaining to the receipt of rents of No. 15 Broad street from the time of its erection to the present day; and also copies of all leases for all tenants in that building for the same period."   The subpœna purports to be issued pursuant to the authority conferred upon the commissioner of accounts by section 119 of the Greater New York Charter to " make such special examinations of the accounts and methods of the departments and offices of the city   *   *   * as the said commissioner may deem for the best interests of the city, and report to the mayor and board of aldermen the results thereof."

In support of the motion the assistant comptroller of the Chase Bank states that he has no knowledge that the commissioner of accounts is conducting any special examination of the accounts and methods of any department of the city, and, further, that any inquiry into the details of the leases between the bank and its tenants is a matter of a private nature with which the city has no concern.   The supporting affidavit of counsel for the bank sets forth that the commissioner, in response to an inquiry, declared that he was investigating the department of taxes in respect to the records submitted to it regarding the income of buildings for the purpose of securing tax reductions, and that the commissioner admitted that the subpœna sought to be vacated was the first " of this type " served.   In addition, stress is laid upon the pendency of certiorari proceedings instituted by the Chase Bank for the purpose of obtaining a judicial review of the assessed valuation of the Broad street property for the years 1933 and 1934.   The claim is made that " it is a fair assumption that if the issuance of the subpœna in question has to do with a tax inquiry, it can relate only to the subject matter of these certiorari proceedings," and that " it would appear that, in order to aid the corporation counsel in resisting the allegations of the relator bank upon the trial of said certiorari proceedings,

the aid of the commissioner of accounts has been invoked to use his assumed power of subpœna to thereby get evidence to aid the city in the trial of said certiorari proceedings."

These charges are met in the affidavit of the commissioner of accounts, by a statement under oath that "because I deem it necessary and desirable for the best interest of the city (and of the citizens at large thereof) I have instituted, and am now engaged in an examination and investigation into the departments of the city connected with certain phases of the work of the assessment, reduction, revision and collection of real property taxes." The commissioner adds that "the investigation has particular reference to the methods and procedure used in the making of assessments, the reduction of assessments on application or by settlement of pending writs of certiorari, and the trial of certiorari proceedings. The investigation relates directly to the procedure used by the department of taxes and assessments, the comptroller and the law department of the city of New York in fixing assessments, granting reductions and litigating certiorari proceedings. This investigation is being carried forward in cooperation with these departments in order to develop better methods of handling the phases of tax work already detailed above. *It is a general investigation.* The instant proceeding is far from being the only subject of the inquiry. It is only one case of many within the purview of the investigation." The commissioner goes on to state that the investigation is intended to show the need for revising the methods of the city departments handling real property assessments and reductions and thus point the way to desirable changes by departmental rules or charter revision. Reference is made to the fact that the State Tax Commission has determined that real property in this city is assessed at only from eighty-two to ninety-four per cent of its full value, and also to the receipt of complaints from taxpayers that various parcels are over-assessed and others under-assessed. Various other circumstances are set forth, which according to the commissioner justify the investigation into the methods used by the city departments dealing with assessments and reductions, *e. g.*, the small percentage of certiorari proceedings actually tried and the large percentage of settlements and refunds made by the city authorities without judicial inquiry or approval. The commissioner adds that "at the present time other subpœnas similar to that in the instant case have been served and are being served for the same purpose;" that "some officers of the department of taxes have already been examined and others in that office, as well as in the comptroller's office and the law department, will be examined on the methods followed by these departments in levying and reducing

assessments on application or by settlement;" that the Broad street property owned by the moving party " is representative of the parcels in the most valuable portion of New York City real estate." As to the petitioner's claim that the actual rents received from the property would be inadmissible upon the trial of a certiorari proceeding, the commissioner takes the position that if this be so the inquiry might lead to a conclusion " as to whether or not amendatory legislation should be enacted clearly establishing the right to give rent rolls in evidence in certiorari proceedings." The commissioner also points out that the applications for reductions of assessments required by the city authorities call for statements as to the actual rents received and that this very petitioner, in support of its request for a reduction, has seen fit to report the rents received by it and the expenses of the property. According to the commissioner the methods used at present by the department of taxes and assessments for the purpose of determining rental value and rent income are " cumbersome and inadequate." The commissioner's affidavit concludes with a statement that " this examination is sought in good faith in pursuance of the duties imposed upon me and of the general investigation which I am making into the accounts and methods of the department of taxes and assessments and of the law department."

That the commissioner of accounts has the power to conduct an investigation into the " methods of the departments and offices of the city " (Greater New York Charter, § 119) is too well settled to admit of the slightest doubt. (*Matter of Edge Ho Holding Corp.*, 256 N. Y. 374; *Matter of Hirshfield* v. *Craig*, 239 id. 98.) In the *Edge Ho Case* (*supra*) Chief Judge CARDOZO, writing for the court, said (pp. 379, 380): " The argument is made that the Commissioner is not at liberty to pursue an inquiry into the efficiency of governmental methods unless those methods have a direct relation to the system of accounts in the office or department subject to his scrutiny. We do not read so narrowly the statutory grant of power. The statute says that he may investigate the accounts and methods of the departments and offices of the city * * *. This does not mean that *both* accounts and methods must be involved in every instance. Investigation aimed at either will wake into action the Commissioner's authority."

In *Matter of Hirshfield* v. *Craig* (*supra*) the same court, in an opinion by Judge LEHMAN, declared (pp. 108, 109): " We have consistently held that the Commissioner of Accounts, appointed by the Mayor, has the right to make special examinations of the accounts and methods of their offices."

The good faith of the commissioner in conducting the inquiry must be assumed, at least in the absence of the clearest showing to the contrary.

" The Legislature * * * made the Mayor or the Commissioner the sole judges of when and whether such examination should be held. The right to hold special examinations is made to depend, not upon the fact that an examination would be for the best interests of the city, but upon the fact that the Commissioner who has been directed to hold it *deems* it for the best interests of the city. The courts cannot assume to pass upon the good faith of public officers in the performance of their functions, and any attempt to pass upon the contention of a proposed witness that he should not be compelled to appear at an examination because the examination cannot result in any benefit to the city or is undertaken for reasons other than that the Commissioner deems it for the best interests of the city, would result in interference with an administrative officer in the performance of his work. * * * *The Legislature permits the Commissioner to decide whether the examination would be for the best interests of the city and to issue subpœnaes* to witnesses. The courts are given no power to review or set aside such decision." (*Matter of Hirshfield* v. *Craig*, 239 N. Y. 98, 110; italics mine.)

If the professed object of the inquiry were " merely a cover and a sham " there might be room for judicial review (*Matter of Edge Ho Holding Corp., supra*, at p. 381.) There is, however, no such showing here. The commissioner of accounts declares, by sworn statement, that an examination into the methods of city departments in respect to assessments and reduction for tax purposes is actually being conducted; that some officers of these departments have already been examined; that subpœnas similar to that served upon the Chase Bank have been served upon others, and that the purpose of the inquiry is to ascertain the " adequacy of present methods of valuing real estate — a question of transcendent importance, for reductions in assessments not only materially enhance the necessity of obtaining revenues from other and extraordinary sources, but have a material effect on the constitutional debt limit of the city and hence upon its borrowing powers." No evidence impugning the good faith of the inquiry is submitted by the movant. The latter does, it is true, refer to the fact that certiorari proceedings to review the assessments for 1933 and 1934 upon its property are now pending, insinuating that the object of the examination is to obtain evidence for use upon the trial of these proceedings which the city could not obtain in any other manner. There is, however, no merit to this contention. In the first place, the movant contradicts itself by stating that the " information * * * would not be admissible on the trial of the case." In the second place, the information as to actual rent

receipts is required to be furnished in applications for tax reductions and the Chase Bank has actually furnished what purport to be the correct figures. The city had the right, in addition, to examine into the correctness of the figures and to compel the production of "any papers relating to such assessment." (Tax Law, § 27.) And lastly, what is most important, a similar objection to a subpœna issued by the commissioner of accounts was overruled in *Matter of Edge Ho Holding Corp.* (*supra*, pp. 378, 379). In the *Edge Ho* case the claim was made that the purpose of the investigation was to procure evidence "in aid of objections then pending undetermined to an award in the Rockaway Public Beach condemnation proceeding, which had gone forward to the stage of a tentative decree." The attorney for the witnesses was also counsel for the claimant, the owner of the award, while the special assistant representing the city in the investigation also appeared on its behalf in opposition to the tentative decree in condemnation. Nevertheless the Court of Appeals reached the conclusion that the motion to vacate the subpœnas should be denied because (p. 379): "We cannot say with fairness that such evidence is unrelated to an inquiry into the efficiency of official methods." The court was of the opinion that (pp. 378, 379) "an inquiry as to the price paid to former owners for land condemned within a period of time not unreasonably remote is fairly related to an inquiry into the efficiency of the methods by which condemnation proceedings are conducted in the offices of the city government responsible therefor."

So here, it is impossible to say that an inquiry into the rents received from the Broad street building of the moving party since its erection in 1928 is not fairly related to the adequacy and efficacy of the methods employed by the appropriate city departments in dealing with tax assessments and reductions.

Considerable light may be thrown on the ability of city officials, under prevailing methods, to ferret out misstatements and, on occasions, falsities contained in applications for reduction of assessments. The extent to which consideration is given to rent receipts and the relationship between rental values adopted by the city authorities and the actual income from rents may likewise be developed. The evidence may disclose ample justification for the enactment of legislation making rent receipts competent as evidence in certiorari proceedings.

The investigation need not be "limited to a consideration of the methods actually in vogue. It may go beyond these into a consideration of what the methods ought to be. (*Matter of Hertle*, 120 App. Div. 717; 190 N. Y. 531; *Matter of Hirshfield* v. *Craig*,

*supra*, p. 112.) The inquiry \* \* \* (may) probe into the past in the belief that discovery of its evils may bring correction in the future." (*Matter of Edge Ho Holding Corp., supra*, p. 380.) What basis is there for holding that the subject-matter of the examination is clearly beyond the proper scope of an examination " of the methods " of the tax and law departments of the city government? To quote from *Matter of Hirshfield* v. *Craig* (*supra*, p. 113): " We give the words ' accounts and methods,' used in the statute a broad construction so as to effectuate the legislative purpose." In that case, it is true, one of the subpœnas was vacated, but only because the inquiry " was aimed at a mere proposal for a contract *unrelated to a settled practice, to any method of the office.*" (*Matter of Edge Ho Holding Corp., supra*, p. 380.)

Nor is there any merit in the argument of the movant that the subpœna served upon it is the first one served. Assuming this to be the fact, the inquiry must begin somewhere; someone must be the first to receive a subpœna. " The Commissioner cannot reasonably be expected to prove everything at once. Only in its immediacy is his inquiry directed to a particular transaction as distinguished from a course of dealing. In its ultimate significance it seeks to uncover something typical of a practice or a method." (*Matter of Edge Ho Holding Corp., supra*, p. 380.) As was so aptly said in the case last cited (p. 381): " Very often the bearing of information is not susceptible of intelligent estimate until it is placed in its setting, a tile in the mosaic. Investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing to the stage of a preliminary contest as to the obligation of the writ. \* \* \* Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold." Nor do I believe there is any merit in the contention that the proposed examination constitutes an invasion of the petitioner's right of privacy. It is far-fetched to assert that the exercise of the powers under the subpœna involves unreasonable search and seizure. Objective facts involving income and expenditure have long been the objects of official scrutiny in connection with the administration of the Federal and State income tax laws.

The motion to vacate is denied.